Henderson et al. *v.* Philadelphia and Camden Ferry Company, Appellant.

Argued October 10, 1933.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Philip Price,* and with him *Barnes, Biddle and Myers,* for appellant.

*John Francis Williams,* and with him *Raymond Pace Alexander,* for appellee.

Opinion by Cunningham, J., February 1, 1934:

About ten o'clock, on the night of August 27, 1931, William Henderson, the minor plaintiff, then eighteen years of age and employed in Camden, N. J., was returning to his home in Philadelphia, as a passenger upon one of appellant's ferry boats. Among other vehicles, then being transported on the ferry boat, was a loaded truck in charge of the employes of Scott Brothers, Inc., the other defendant. As the boat was entering its slip on the Philadelphia side of the river, the truck moved from its stationary position and struck and injured Henderson.

The action out of which this appeal arose was instituted by Henderson, through his mother and next friend, Ethel Watters, and by her in her own right, upon the theory that the minor plaintiff's injuries were caused by the joint negligence of the employes of the respective corporate defendants. A verdict was directed in favor of Scott Brothers, upon the ground that plaintiffs had adduced no evidence of any negligent act, or omission, by the employes in charge of the truck, and the case was submitted to the jury as against the ferry company. The verdict awarded $250 damages to the minor plaintiff; and this appeal is from the judgment entered thereon.

Appellant's principal complaint, specified in its second assignment, is that the trial judge erred in charging that no question of contributory negligence was involved under the evidence. This assignment necessitates an examination of the testimony.

The negligence charged against appellant was that the ferry boat was operated so negligently, when about half-way into the slip, that it was permitted to bump against the pilings with such force that the truck was dislodged, moved forward, and injured the passenger. Appellant contended that Henderson, although there was ample accommodation for him in the section reserved for passengers, voluntarily entered and stood in the space reserved for vehicles, thereby assuming the risk of injury.

There was evidence that two of Scott Brothers' trucks were standing side by side in the forward part of the boat and in position to be the first vehicles driven off when it was docked; that an employe of appellant placed blocks, prepared for that purpose, against the front wheels of the truck; and that the driver had turned off the lights, stopped the engine, put on the emergency brake, dismounted from the truck, and was standing beside it, talking to the driver of the truck upon his left.

Henderson's description of the accident follows:

"As I entered the boat it was crowded because I was late. Q. What do you mean by 'crowded'? A. All the seats were taken. I moved to the front, not outside, but towards the front of the boat. As the boat was docking, everyone was moving forward. I came forward [on the north side] and between the last two posts there was a [horizontal] rail and I was on a leaning position against the rail. As the boat hit the dock, one blow, the truck moved forward, people were screaming and hollering and yelled 'Watch out; watch out'. Then I felt the bumper of the truck graze me, and as I noticed someone else was jammed in the same time, and everyone was trying to move the truck back. ...... Q. There are two entrances, one for vehicles and one for passengers? A. Yes. Q. Where is the vehicle entrance? A. In the middle. Q. The passengers' entrances are on each side? A. Yes. Q. What divides the vehicles from the passengers' entrances? A. Iron posts, the last two connects with a rail."

He illustrated his testimony with a photograph of the forward part of the boat, showing in the center a planked gangway, comparable with the cartway of a street and manifestly designed and intended, at least primarily, for the use of vehicles and their drivers and occupants and protected with double iron gates erected between the pillars at the bow which also support the upper deck, and showing a cabin on each side for the use of passengers, traveling as pedestrians, with a passageway, similar to a pavement, extending from each cabin along the rail to the bow. These passageways, or foot-walks, were evidently intended for the exclusive use of pedestrians and had an elevation of some inches above the gangway and are separated from it by a row of six posts, apparently from four to five feet in height; each passageway is closed and

protected at the bow by a single iron gate, separate from those erected across the gangway. Henderson's testimony continued: "Q. Was that the front portion of the boat entering the Philadelphia side? A. Yes, sir. Q. Where were you, your body, in what respect to those two divisions for the passengers and vehicles? A. I was in a leaning position on that rail, on the passenger side. Q. Was any part of your body in the vehicular side? A. No, it was not. Q. You said you heard some screams and the next thing you saw a truck or part of a truck? A. I did not see the truck until afterward. Q. What did the truck do or any part of it? A. The bumper? Q. Yes. A. Hit me. Q. Hit you where? A. Jammed me in the right buttock. ...... Q. What did it do to you? A. It caught me. Q. Was that a bruise or deep cut or what? A. It was a deep cut. ...... Q. What did the bumper mash you against? A. Just like where the rail and the posts meets. ...... Q. How far was the boat from the wharf at that time? A. It was not one-half in yet. It was just entering. Q. Now, after the contact with the truck, the time of the contact with you, did it continue on? A. Yes, it did. Q. How far did it go? A. Jammed into the gate."

William Banning, the driver of the truck which struck Henderson, placed him in an entirely different location at the time of the accident. That part of Banning's testimony reads: "Q. Do you remember Henderson who was on the stand here? A. Yes, sir. Q. Was Henderson hit or hurt by your truck? A. He was, he was in the middle of the driveway, not on the sidewalk. Q. Sure of that? A. Yes, sir positively. Q. What do you mean by 'the driveway'? A. Standing out where the trucks be, several of them were standing out there. Q. You saw Henderson in between—A. The side of the bumper. Q. Which side? A. The left side. Q. In what portion of the ferry

boat? A. Well, he was in the middle of the driveway, leaning over the gates like this (indicating). Q. Describe more fully what you mean by 'gates.' A. The iron gates that go across that location, on the front of the boat. Q. And that was where he was? A. Yes, sir.''

During his cross-examination, this witness testified to facts which supported Henderson's version of the manner in which the boat was handled and from which an inference of negligence upon the part of appellant's employes could be drawn. These facts appear from the following excerpts from his testimony: ''Q. You have not told us yet what happened to your truck. Did it stop back of the post? A. No, sir, when the fellow got hit, the side of the truck rolled down— Q. Where did it roll down? A. To the front of the people. Q. What caused it to roll? A. The jar, I guess. ...... Q. What kind of a jar was it? A. It was a pretty good jar. ...... Q. Was it severe enough to break the truck away from the blocks under the wheels? A. Yes, sir. Q. Had it ever done that before? A. Not to my knowledge, never before. ...... Q. It was an unusually hard bump? It was a pretty good bump, wasn't it? It was out of the ordinary? A. Yes, it was, it knocked me down myself. Q. Where did your truck go when it was turned loose? A. Toward the front of the boat.''

Albert McCann, a passenger on the boat and apparently a disinterested witness, corroborated Banning's testimony by stating he was not able to identify Henderson as one of the two men injured by the truck, but that the persons injured ''were standing in the driveway where the trucks are supposed to be, leaning over the rail, the iron gate.''

There was, therefore, conflicting testimony with respect to Henderson's location on the boat when injured. It is the contention of counsel for appellant

that if the testimony of Banning and McCann with relation to his position should be accepted by the jury, an inference of contributory negligence upon his part could be drawn therefrom and the jury should have been so instructed.

The portion of the charge containing the instruction complained of and specifically excepted to at its conclusion reads:

"Now, the court wants to emphasize, and particularly draw to your attention the fact that this accident did not happen after the ferry boat had docked on the Philadelphia side. If, after that ferry boat had been securely fastened to the platform of the landing on the Philadelphia side, and then, as both passengers and vehicles were leaving the ferry boat the accident happened, you would have the element of contributory negligence to consider. But the only evidence in the case is that this accident happened just as the ferry boat was entering the slip on the Philadelphia side.

"You are perfectly familiar with the ferry slips both on the Camden side and the Philadelphia side of the Delaware River. They are made up of a series of pilings in flange shape; the ferry boat was entering the slip on the Philadelphia side and had gotten about halfway in, when, according to the testimony, this accident happened. Therefore, I am going to state to you that the court is aware of no authority and no justification to charge you as a matter of law that it is contributory negligence for a passenger, during that passage, between Camden and Philadelphia, to occupy that portion of a ferry boat that is allotted to vehicles, trucks and wagons. I have made that trip innumerable times, and I guess you have likewise done so, particularly prior to the opening of the Delaware River Bridge. I have seen hordes of people walking through the vehicular driveway, not the lanes for pas-

sengers, but in their anxiety to get to the bow of the boat quickly, particularly as it approached the Philadelphia side, in their anxiety to get out they swarm through there two or three abreast and sometimes more than that. I do not think there is any sound reason to say that before that boat has safely docked on the Philadelphia side, that it is a matter of contributory negligence for a passenger to occupy that area of the ferry boat. Therefore, on the question of liability, we are going to submit to you, as triers of fact, the question as to the manner in which that ferry boat was operated, because you have conflicting testimony in that respect."

We think it was reversible error to thus withdraw from the jury the question of any possible contributory negligence upon Henderson's part by saying, in effect, that even if the jury should find he had voluntarily left the space reserved for foot passengers and placed himself in a leaning position against the gates of the vehicular gangway, they could not convict him of contributory negligence.

Under his own testimony he was a frequent passenger upon, and familiar with the operation of, appellant's boats and there was ample room for him to stand where he said he stood—in the space reserved for pedestrians.

Although the facts in Hopkins v. West Jersey and Seashore R. R. Co., 225 Pa. 193, 73 A. 1104, cited and relied upon by appellant, are not identical with those here present, the plaintiff in that case was injured while voluntarily using the vehicular, rather than the passenger section, of a ferry boat and the following observation of Mr. Justice Stewart is equally applicable to the case at bar.

"However the defendant company may have tolerated the use of this gangway by passengers impatient to reach the front of the boat, it is so manifest to ordinary observation that such gangway is intended

for a use which makes it dangerous for passengers, that, except as safe and suitable accommodations for passengers are shown to have been lacking, the passenger who voluntarily takes his place in it must he held to have assumed the risk of injury. We have said with respect to street cars, that the proper and assigned place for passengers is inside the car; that unless he shows some valid reason to excuse, a passenger is bound to put himself in the appointed place, and if he does not, he takes the risk of his location elsewhere: Thame v. Traction Company, 191 Pa. 249. There is no reason why this rule should be limited in its application to railroads or street-railways; it applies generally.''

The question of Henderson's contributory negligence as well as that of the negligence of appellant's employes, should have been submitted to the jury with proper instructions relative to the conflicting evidence upon each of these issues. We, accordingly, sustain the second, assignment and will direct that the case be retried.

In view of the disposition we have made of the second assignment, it is not necessary to consider the first, charging error in overruling the motion of appellant's counsel for the withdrawal of a juror because of alleged improper remarks of counsel during the argument. We are confident counsel will refrain from indulging in any appeals for a verdict upon any grounds, or in any amount, other than those clearly authorized by our system of administering justice.

Judgment reversed with a venire.